(117 App. Div. 730)

### BERRYMAN v. BANKERS' LIFE INS. CO.

(Supreme Court, Appellate Division, First Department. February 15, 1907.)

1. INSURANCE—DIVIDENDS—IMPAIRMENT OF CAPITAL.

Where dividends were declared by trustees of an insurance company out of capital in violation of Insurance Law, § 83, Laws 1892, p. 1968, c. 690, and Pen. Code, § 594, authorizing payment of dividends to policy holders only out of surplus, a policy holder could not recover such dividends declared but unpaid.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 47.]

2. SAME—VOLUNTARY PAYMENT—RECOVERY.

Where an insurance company paid dividends to policy holders, which were not formally declared by the board of directors or executive committee, but neither the charter nor the by-laws provided specifically by whom dividends should be declared and it did not appear that the payment of such dividends impaired the capital of the company, the payment was voluntary, precluding the company from recovering them.

3. SAME—CHARGE AGAINST POLICIES.

Where an insurance company was not entitled to recover dividends alleged to have been wrongfully paid to policy holders, it could not charge such dividends as a liability against the policies on which they were paid.

Submission of controversy on agreed statement of facts by John Berryman against the Bankers' Life Insurance Company. Judgment for defendant in part.

This controversy is submitted under section 1279, Code Civ. Proc., upon an agreed statement of facts, as follows:

The Bankers' Life Insurance Company of the City of New York is a corporation originally organized as a fraternal organization on March 24, 1869, under the name of the "Bank Clerks' Mutual Benefit Association of the City of New York." On the 15th day of August, 1884, it was formally incorporated under chapter 175, p. 172, of the Laws of 1883, under the same name, and was thereafter, on June 28, 1893, reincorporated under article 6 of chapter 690, p. 2004, of the Laws of 1892, known as the "Insurance Law," for the purpose of doing business on the regular assessment or co-operative plan, under the same name. By an order of the Supreme Court of the state of New York, made April 27, 1894, its name was changed to the Bankers' Life Insurance Company of the City of New York. Pursuant to the provisions of chapter 690, p. 1718, of the Laws of 1893, entitled. "An act authorizing all insurance companies transacting business on the co-operative or the assessment plan to reincorporate as a stock corporation under its existing corporate name," it reincorporated as a stock corporation on the 2d day of August, 1899, with a capital stock of $100,-000, and has ever since been doing business as a stock company. As a stock company, the Bankers' Life Insurance Company was reasonably successful at the start, and it gradually increased its surplus, so that, on the 1st day of January, 1902, it had, as appears by its report, a surplus, beyond its capital

of $100,000, of $185,576. In the fall of 1902, the stock control of this company, which was then lodged in two of its directors, William C. Demarest and Charles H. Fancher, was transferred to a corporation known as the "Knickerbocker Investment Company." A voting trust agreement was entered into by the officers of the Knickerbocker Investment Company without the knowledge or consent of the stockholders, by the terms of which the stock control of the Bankers' Life Insurance Company was vested for the period of five years in three voting trustees, Foster N. Vorhees, Edward C. Stokes, and William Scherer, who promptly elected themselves and certain of their friends and relatives into office. Foster N. Voorhees became president of the company, William Scherer, vice president, and his son, general counsel. Edward C. Stokes became a director, and the position of third vice president was created for his brother, Howard K. Stokes. Before assuming office, the stock had always paid 6 per cent. dividends. They ran the company at a rate of expense not commensurate with the premium income of the company. They devised different schemes to make their policies attractive. Among other things they did, was to declare and pay out dividends on participating policies, which had never been earned, and armed with literature showing the payment of these dividends, their agents sought to procure business by showing the attractive results obtained.

During the year 1902, the company lost $46,562 in surplus, and the officers declared and paid $21,035 dividends to policy holders. During the year 1903, the company lost $75,542 in surplus, and the officers declared and paid $25,827 dividends to policy holders. During the year 1904, the company made an apparent gain of $23,253, and declared and paid dividends of $35,000 to policy holders. During the year 1905, the surplus of $86,724, and the capital of $100,000 suffered further diminution, so that the statement of December 31, 1905, showed that the entire surplus had been wiped out, and the capital reduced from $100,000 to $28,403, an impairment of $71,597 in its capital, and yet during that year the company declared to the policy holders $81,000 in dividends, of which $49,000 was paid and $32,000 not yet withdrawn.

A tabulated statement, showing capital and surplus from January 1, 1902, to December 31, 1905, together with losses or gain on the business and dividends of paid policy holders, is as follows:

| Capital ($100,000) and Surplus. Year. | | Loss or Gain During the Year. Loss. | Gain. | Dividends Paid Policy Holders. |
|---|---|---|---|---|
| Jan. 1, 1902, | $285,576 | | | |
| Dec. 31, 1902, | 239,013 | $ 46,563 | | $ 21,035 |
| Dec. 31, 1903, | 163,471 | 75,542 | | 25,827 |
| Dec. 31, 1904, | 186,724 | | $23,253 | 35,401 |
| Dec. 31, 1905, | 28,403 | 158,321 | | 49,537 |
| | | $280,426 | $23,253 | $131,800 |
| | | 23,253 | | |

Net loss between Jan. 1, 1902, and
Dec. 31, 1905..................... $257,173
Dividends declared but not paid....................................... 31,019

$162,819

The capital was found to be impaired by the New York insurance department in the spring of 1906, and the stockholders of the company were called upon to make good the impairment. All the minority stock which was controlled by the management and their friends, with the exception of five shares of stock, refused to make good any portion of the impairment, and the Knickerbocker Investment Company was compelled to pay, and did pay, into the treasury of the company the whole amount of the impairment, amounting to some $72,000. Before doing so, however, the Knickerbocker Investment Company insisted that the voting trust agreement be abolished, and the directors and officers of the Bankers' Life Insurance Company should resign. This was

finally acquiesced in, every officer and director of the company resigned, and in their place were elected the present management of the Bankers' Life Insurance Company. Upon an examination made by the new management into the affairs of the company, it was ascertained that the capital and surplus of $285,000 which existed in 1902, had been reduced to $28,000 in 1906. The corporation sustained a loss of $257,000 in four years. Its reports during that time show that its rate of mortality was lower than the expected rate, and that it had suffered no loss in its investments, and it was found that, although losing $257,000 during these four years, they had paid over $131,000 of dividends, and had declared, and not paid out some $31,000 of dividends. This latter item was considered a liability by the department of insurance, and treated as such in the report of 1905. These dividends had never been passed upon by the board of directors, but were paid by the officers. With an insignificant exception, the dividends had not been passed upon by the executive committee. Neither the charter of the company, nor its by-laws, provide how dividends shall be declared and paid. Prior to 1902, all dividends had always been passed upon by the board of directors.

Following are all the by-laws which describe the powers of the board of directors and the respective officers:

"(1) The officers of the company shall consist of a president, a first, a second, and a third vice president, a secretary, an assistant secretary, and a treasurer, and two or more of said offices, except that of president, may be filled by one individual.

"(2) The president shall be ex officio a member of all committees. In order to expedite the business of the company, he shall appoint from the board of directors, a finance committee of six members, and an executive committee of five members, and shall provide for said committee a clerk who shall act as secretary, and keep a correct record of the proceedings of such committees. The president shall have the general direction and superintendence of the affairs of the company, and shall render reports of same at every stated meeting of the directors.

"(3) The secretary, the assistant secretary, and the treasurer shall perform their duties, under the direction of the president. In the absence of the secretary his duties shall be performed by the assistant secretary, and, in the absence of the treasurer, his duties shall be performed by the secretary or the assistant secretary in the capacity of acting treasurer.

"(4) The officers of the company shall have power, under the rules and regulations for the time being, of the board of directors, to negotiate contracts for business on life and for annuity, and all other contracts necessary for the company in the management of its affairs. All such contracts shall be signed by at least two of the executive officers of the company, the printing of facsimile signature of the president to such contracts being a compliance with this provision.

"(5) The executive committee, two members of which shall constitute a quorum, shall assist the president in the general management and conduct of the business of the company.

"(6) The board of directors shall have charge of all funds of the company and see to the safe investment thereof. All moneys shall be deposited in the name of the company in such bank, trust company, or depositaries, as shall be designated by such board; it being required that all checks against the funds of the company shall be signed by at least two of the executive officers of the company. The directors may determine the rates of premium, the amounts to be insured on any one life, and the terms of insurance, and shall have power to purchase, for the benefit of the company, any policies of insurance, dividends, or other obligations issued by the company, and also any claims of policy holders for profits growing out of its business."

The dividends can be roughly treated in two classes: Those that have been declared and paid out; and those that were declared, but have not yet been withdrawn by the policy holders, amounting, as above stated on the 31st day of December, to $31,000. As to these latter amounts, it became obvious to the present officers of this company that they had absolutely no right to pay dividends which they knew had not been earned, and that such action on their part would render them liable to prosecution. They knew, further, that the

impairment of the capital of the company, amounting to $72,000, found on December 31, last, was partly caused by the payment of unearned dividends. They felt they had no right to discriminate between the dividends declared and paid, and the dividends declared, but not withdrawn, and the only way was to treat them all alike. Hence the resolution passed March 28, 1906.

Upon assuming office, the new board of directors, in April of 1906, passed the following resolutions:

"Whereas, an examination of the affairs of the company shows that during the following years the following dividends have been paid to policy holders, namely: During the year 1902 the sum of $21,034.77; during the year 1903 the sum of $25,827.44; during the year 1904 the sum of $35,401.52; during the year 1905 the sum of $49,537.28; and during the year 1906 to date the sum of $11,876.47;

"Whereas on the 1st day of January, 1902, the capital and surplus of the company amounted to $285,576.06, and whereas, since the 1st day of January, 1902, the business of the company has yearly shown a net loss until the 1st day of January, 1906, the above capital and surplus of $285,576.36 was reduced to $28,403 43;

"And, whereas, each of the above dividends as paid or declared by the company were not paid or declared out of the profits of the company, but were paid or declared out of the reserve, capital, and surplus, and such declaration was therefore void and illegal:

"Resolved that all actions of the board of directors, of the executive committee, or of the officers of the company, in declaring such dividends, be rescinded, and that the following action be taken relative to the dividends declared, or to be declared, on the different policies:

"As to ordinary life, limited payment life and endowment policies, editions April, 1898, and January, 1899, the dividends so paid shall be charged against such policies, the insured being notified, and shall remain a lien thereupon at 5 per cent. per annum until paid, which payment may be made by note, cash or installments with subsequent premiums, provided, however, that where such dividends, or any part thereof, are still standing to the credit of such policies, the same shall be charged back, and their respective holders be notified of same.

"As to all other forms of policies, all dividends paid since the 1st day of January, 1902, shall be a lien upon the policy with 5 per cent. interest from the date of the several payments, and shall be deducted in any settlement of the policy.

"As to the item of $31,019.06, or any other dividends declared since the 1st day of January, 1902, and carried on the books of the company as a liability, the same not having been earned, and having been improperly declared, as aforesaid, they shall be abrogated and the amount thereof shall be turned over to the profit and loss account of the company.

"As to all dividends that have been declared and paid on any form of policy since the 1st day of January, 1906, these dividends shall be a lien upon the policy together with 5 per cent. interest from the several dates of payment, and shall be deducted in any settlement made of the policy.

"All interests or dividends heretofore paid, or credited, shall be charged up to date on each policy, and then on December 31, 1906, and annually thereafter."

The plaintiff, being of full age, is the holder of its participating 20 payment life policy No. 7,891 for $5,000, issued on the 14th day of October, 1899, calling for the payment of an annual premium or consideration of $284.50, which is in full force and effect. He received in dividends the following amounts:

| | | | |
|---|---|---|---|
| In 1901, the sum of | | | $ 57.15 |
| " 1902 " " " | | | 28.50 |
| " 1903 " " " | | | 30.00 |
| " 1904 " " " | | | 31.00 |

$147.20

In 1905 dividends applicable to the policy, and amounting to $50.60, were declared, but not paid.

Plaintiff demands judgment for the sum of $50.60, together with costs.

Defendant demands judgment: (1) That plaintiff be deemed to be not entitled to such sum of $50.60. (2) That the defendant have judgment against plaintiff for the sum of $147.20, to be charged as a lien on his policy.

Argued before PATTERSON, P. J., and INGRAHAM, LAUGHLIN, CLARKE, and SCOTT. JJ.

George W. Carr, for plaintiff.
D. Cady Herrick, for defendant.

SCOTT, J. The dividends over which this controversy has arisen may be divided into two classes: Those declared, and partly paid, out of capital, and those declared out of surplus; the payment of which did not, however, impair the capital. The dividend which plaintiff seeks to recover falls within the former class. Nothing is better settled than that dividends should be paid out of surplus and profits, and cannot be lawfully paid out of capital contributed by the shareholders, for the purpose of carrying on the company's business, and for the protection of its creditors. 2 Thompson on Corp. § 2126; Morawitz on Corp. § 453. To pay a dividend otherwise is forbidden by Pen. Code, § 594, subd. 1, and Insurance Law, Laws 1892, p. 1968, c. 690, § 83, authorizes dividends to policy holders to be paid only out of the surplus of the company. To require the defendant to pay plaintiff the premium declared upon his policy for the year 1905, which, if paid, would necessarily be paid out of capital, and not out of surplus, would be to compel the officers of defendant to do an illegal act. Of course no such judgment can be made. As to the right of the defendant to recover from other policy holders dividends which have been paid them out of capital, we cannot now pronounce any judgment as the parties to be affected are not before the court. Concerning the dividends heretofore paid to plaintiff, which it is now sought to charge against him as a liability, a different question arises. It does not appear that the payment of these dividends impaired the capital of the company. The only ground of objection to them is that they were not formally declared by the board of directors, or even by the executive committee. Neither the charter or by-laws provide specifically by whom dividends shall be declared, and, in the absence of any specific provision on the subject, we suppose that the discretion of determining how much of the surplus and profits earned by the company should be divided among the stockholders, is a matter peculiarly for the board of directors.

Perhaps if the company refused to pay such a dividend, it might have defended a claim for the dividend, upon the ground that it had never been declared by competent authority. But, having paid it to plaintiff, who, as a policy holder, stood in a position analogous to that of a creditor, without notice of any infirmity in the manner of declaration, we think that the payment must be considered as a voluntary payment by the defendant, and that it may not now be recovered. The acquiescence of the company in the unauthorized act of its officers implies ratification. If the company could not recover back the dividends,

we know of no principle that will permit it to charge them as a liability against the policy to be collected thereafter.

There must be judgment, without costs, first, that the plaintiff is not entitled to recover from defendant the sum of $50.60, declared as a dividend upon his policy in the year 1905, but not paid; and, second, that the defendant is not entitled to recover from plaintiff, to be charged as a lien upon his policy, the sum paid him in the years 1901 to 1904 both inclusive, as dividends upon his said policy. All concur.